UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| MALLORY O'SHEA AS ADMINISTRATOR OF THE ESTATE OF STANLEY SEWALL; and DIANE SEWALL, <br>     Plaintiffs <br><br> vs. <br><br> WOODBINE SENIOR LIVING, LLC., <br>     Defendant | Case No.:_____ <br> Jury Trial Demanded |

## COMPLAINT & DEMAND FOR JURY TRIAL

1. Plaintiffs MALLORY O'SHEA AS ADMINISTRATOR OF THE ESTATE OF STANLEY SEWALL and DIANE SEWALL file the instant complaint against Defendant WOODBINE SENIOR LIVING, LLC., and states as follows, while demanding a jury trial:

### PARTIES, JURISDICTION, AND VENUE

2. Plaintiff MALLORY O'SHEA, duly appointed as administrator of the ESTATE OF STANLEY SEWALL, is a resident of 76 Glenwood Ave, Poughkeepsie, NY 12603. Pursuant to 28 USC § 1132, MALLORY O'SHEA, as the administrator of the ESTATE OF STANLEY SEWALL shall be deemed a citizen of New Hampshire, Stanley Sewall's last domicile.

3. Plaintiff DIANE SEWALL was the lawful spouse of STANLEY SEWALL and is a resident of 47 Seabury Rd, York, ME 03909

4. Defendant WOODBINE SENIOR LIVING, LLC. is a limited liability corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Tampa, FL.  At all relevant times, Defendant WOODBINE SENIOR LIVING, LLC was the owner, operator, and manager of Spring Village at Dover, a "Supported Residential Care Facility" located at 35 Pointe Pl, Dover, NH 03820.  As referenced in the contemporaneously filed Diversity Disclosure Statement, its three members are residents of Florida, New Jersey, and Pennsylvania.

5. This Court has personal jurisdiction over Defendant WOODBINE SENIOR LIVING, LLC., which conducts business in New Hampshire through its actions and through the joint actions of its subsidiary companies and agents, *including but not limited to*, the Spring Village at Dover facility at issue in this Complaint. Defendant WOODBINE SENIOR LIVING, LLC. derives significant revenue from its activities in this state. Defendant WOODBINE SENIOR LIVING, LLC. reasonably anticipates being hailed into a New Hampshire court and has consented to the jurisdiction of this Court.

6. Federal diversity in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of New Hampshire and Maine, respectively, different states than Defendants' members' states of residency, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper within this District because the events giving rise to this action happened in or are closely related to this District.

## JURY TRIAL DEMANDED

8. Plaintiff demands a trial by jury on each of the causes of action pleaded herein.

## FACTS AND ALLEGATIONS

9.      On December 31, 2019, the State of Vermont and WOODBINE SENIOR LIVING, LLC entered into a settlement agreement in which WOODBINE SENIOR LIVING, LLC agreed to pay a $120,000 fine and to never operate in Vermont again.

10.     Spring Village at Essex, a 56 bed "memory care" community in Essex Junction, VT, was operated by WOODBINE SENIOR LIVING, LLC.  The facility was accused of violating Vermont's Consumer Protection Act by misrepresenting to families of prospective residents, via its marketing materials and conversations, that it would be able to care for their loved one at all stages of dementia and aging, regardless of the level of care that they needed.

11.     The false and deceptive representations at issue – which WOODBINE SENIOR LIVING, LLC was responsible for - included identifying Spring Village at Essex as "an Assisted Living community specializing in care for people with Alzheimer's, Dementia, and Memory Loss;" that it was "for those who need a high level of care;" and that it provided for "aging in place, including end of life care."

12.     Spring Village at Essex made similar oral representations to many prospective residents' families.

13.     However, Spring Village at Essex could not have possibly followed through with its marketing representations because it was only licensed as a "residential care home."  Per Vermont's state regulations, residential care homes like Spring Village at Exeter cannot provide care for residents who need full-time nursing care.  They are even required to discharge residents when it becomes apparent that they require a higher level of care.

14.     Ultimately, Spring Village at Essex ended up having to issue several notices of discharges to residents who need a higher level of care. Several of these families filed complaints

with the state Ombudsman's office alleging that they had been promised care through end of life, prompting the state into action.

15.     "In lieu of instituting an action or proceeding against Woodbine, the Attorney General and Woodbine" entered an Assurance of Discontinuance on December 31, 2019, which Plaintiff fully incorporates herein by reference.

16.     On March 13, 2020, just three months after being banned from operating in the State of Vermont, WOODBINE SENIOR LIVING, LLC began operating in the State of New Hampshire for the first time through a new facility called Spring Village at Dover.

17.     WOODBINE SENIOR LIVING, LLC chose to apply for and become licensed as a "Supported Residential Care Facility."

18.     New Hampshire regulations for "Supported Residential Care Facilities" are similar to the Vermont regulations cited above for "residential care homes" in that they both place limits on type of care that can be provided (less than a nursing home), and they are both required to discharge and/or transfer residents who require a higher level of care than they can offer.

19.     New Hampshire's RSA 151:9, VII. (a)(2) defines "Supported Residential Health Care" as "reflecting the availability of social or health services, as needed, from appropriately trained or licensed individuals, who need not be employees of the facility, but shall not require nursing services complex enough to require 24-hour nursing supervision. Such facilities may also include short-term medical care for residents of the facility who may be convalescing from an illness and these residents shall be capable of self-evacuation."

20.     New Hampshire's regulations for "Supported Residential Health Care" facilities are laxer and vaguer than those for nursing homes (e.g., required to have a "**sufficient** number of

staff."). *See* He-P 805. In addition, such facilities do not need to become certified (or tracked) by the Centers of Medicaid Services (CMS) and can choose to only take private pay.

21. Conversely, "Nursing Homes" provide a higher level of care and are defined as "providing a range of social and health services, including 24-hour-a-day supervision and the provision of medical care and treatment, according to a plan of care, by appropriately trained or licensed individuals who are employees of or who are under contract to the facility."

22. New Hampshire's regulations for "Nursing Homes" are much more detailed and demanding than those for "Supported Residential Health Care Facilities" (e.g., "Services of a licensed nurse required 24 hours a day; Services of RN required at least 8 hours within a 24-hour period."). In addition, Nursing Homes are required to be certified (and tracked) by the CMS.

23. New Hampshire has several different statutes that require a residential care facility like Spring Village at Dover to discharge and/or transfer a resident when they cannot meet their needs, either on account of the license issued to the facility or a lack of adequate resources. *See* RSA 151:5-a; RSA 151:19; RSA 151:21 V; and RSA 151:26.

24. WOODBINE SENIOR LIVING, LLC immediately began marketing Spring Village at Dover in a manner nearly identical to how it had improperly marketed Spring Village at Essex in Vermont.

25. On March 17, 2020, four days after becoming licensed as a Supported Residential Health Care Facility, WOODBINE SENIOR LIVING, LLC issued a press release for Spring Village at Dover that stated in part:

- "In most circumstances, residents are able to stay in their familiar suite with their familiar care partners **right through end of life**."
- "Specializing in memory care."

- "Our staff are highly trained to assist our residents that do have a dementia diagnosis."

26. The two main buckets of marketing misrepresentations that WOODBINE SENIOR LIVING, LLC made for Spring Village at Dover and that are at issue here are those relating to: 1) care "right through end of life"; and 2) specialized "memory care."

27. It is not by accident that WOODBINE SENIOR LIVING, LLC continued to make these two representations their top two selling points, even after getting kicked out of the State of Vermont. WOODBINE SENIOR LIVING, LLC knows through market surveys and other efforts that these are two uniquely important considerations for their "potential customers."

28. WOODBINE SENIOR LIVING, LLC – through not just Spring Village at Dover, but its various facilities – made these marketing representations knowing that it cannot possibly follow through with these promises. This in part because: 1) its chosen license status prohibits it from providing care "right through end of life"; and 2) it chooses not to dedicate any meaningful effort or resources towards providing any type of specialized "memory care," rendering it a hollow and misleading marketing representation.

29. By the spring of 2022, Mr. Stanley Sewall had been suffering from recurrent falls and exit seeking behavior at his home, where he still lived. Mr. Sewall suffered from dementia and severe anxiety, and his two daughters – Mallory O'Shea ("Mallory") and Amanda Hohlstein ("Amanda"), together with their brother Jeremy Sewall ("Jeremy") - feared for his safety and wellbeing. Additionally, Mallory, Amanda, and Jeremy had been made aware that their mother, Diane Sewall, was no longer able to continue serving as Mr. Sewall's primary caregiver in their home. After careful thought and consideration, Mr. Sewall's adult children began looking for a care facility to help take care of their father and ensure his safety.

30. During the search process, Mr. Sewall's children reviewed the website of Spring Village at Dover. Some of the specific marketing representations available on their website at that time that they reviewed and relied upon include:

- "We offer a safe option for people who wish to live independently with minimal assistance, and for those who need a high level of care."

- "We are able to meet our resident's needs wherever they are on their journey."

- "Specializing in Memory Care."

- "Our dementia care professionals provide safe and secure 24-hour support."

- "The Present Moment Program is a specialized lifestyle and leisure program based on current best dementia care practices proven to generate such positive outcomes as prolonging a person's existing abilities and slowing the progressing of the symptoms of dementia. The program is overseen by a Certified Dementia Care Practitioner and every Spring Village at Dover team member who cares for your loved-one has specialized dementia training to ensure that your residents are living their personalized best quality of life in every moment."

31. Spring Village at Dover staff similarly made oral representations to Mr. Sewall's children regarding end of life care and specialized memory care services from specially trained dementia care staff.

32. Mr. Sewall's children relied on the written and oral representations described above in deciding to admit their dad to Spring Village at Dover.

33. On June 1, 2022, Mr. Sewall was admitted to Spring Village at Dover. His records upon admission, and throughout his stay, clearly indicate that he is has a history of falls and is "a high fall risk."

34. This is substantiated by his Client Coordination Note Report drafted on April 11, 2022, which highlights his fall risk and exit seeking behavior, specifically stating that he has had "several falls in the past 3 months."

35. Despite his documented history of multiple falls, on Mr. Sewall's Fall Risk Assessment, completed on his intake date of June 1, 2022, the staffer responsible at Spring Village at Dover noted that he had "0" falls in the past 6 months, and deemed him a "moderate" fall risk.

36. On Mr. Sewall's intake form, the "goal/objective" set by Spring Village at Dover was to ensure that Mr. Sewall remained free from injury and falls for 180 days.

37. Mr. Sewall suffered numerous falls throughout his stay, several of which caused serious injury. Throughout these incidents, Mr. Sewall's children expressly asked if this was the right level of care and questioned whether they needed to move their dad to a nursing home. They were assured that Spring Village at Dover could keep people through all of the stages up to death and that no higher standard of care was required.

38. On June 2, 2022, just one day after he was admitted, Mr. Sewall was found on his hands and knees outside of the room of another resident after an unwitnessed fall.

39. On June 4, 2022, a staff member witnessed Mr. Sewall stand up from his wheelchair, stumble, and fall to the ground in the living room during an activity.

40. On June 5, 2022, Mr. Sewall was found on the ground in the courtyard after an unwitnessed fall, at which time he was complaining of pain from his rear.

41. On June 7, Mr. Sewall's daughter, Amanda, emailed Spring Village at Dover: "It seems like my dad is a handful for you guys. . . We're concerned he's too much for Spring Village? The staff has been really friendly and agreeable but the follow through is not really there."

42. Amanda's email went on to ask: "He's been there a week and no one has washed him, brushed his teeth, anything light that. I know he is difficult but there are not even towels in his bathroom? . . .His toothpaste has never been open [sic]."

43. In response, the Director of Community Relations at Spring Village at Dover sent back an email, stating: "I have asked the Memory Care Director to join the meeting at 3pm, she has a ton of experience in this field. I have also forwarded this email to Teri and Stephanie, so that they can follow up with your clinical concerns."

44. On June 9, 2022, Mr. Sewall was found laying face down on the floor in the hallway after an unwitnessed fall, at which time he was complaining of head pain.

45. On June 9, 2022, Amanda emailed Spring Village at Dover: "I got a good look in my dad's mouth yesterday. He has a broken molar that is VERY infected. We know that the adjustment to being placed is difficult but the man we dropped off a week ago is not the man that is there now."

46. On June 11, 2022, Mr. Sewall was found laying face down on the living room floor next to his wheelchair after an unwitnessed fall.

47. On June 26, 2022, Mr. Sewall was found on the dining room floor after an unwitnessed fall, bleeding from the back of the head and complaining of hip pain. He was transported to the Emergency Department ("ED") of Portsmouth Hospital.

48. While in the hospital, Mr. Sewall was assessed again for his fall risk, where he was determined to be of "high risk."

49. On June 26, 2022, Mr. Sewall received a diagnosis of a left hip fracture associated with the June 26, 2022 fall.

50.     Up through this point, Mr. Sewall had suffered no less than 6 falls in less than one month, several of which had caused injury and/or required treatment at the ED.  Defendant clearly should have made adjustments to account for or intervene with respect to Mr. Sewall's clear and obvious fall risk so that he could receive higher care and more supervision.

51.     In addition, contrary to Defendant's marketing representations about its specialized and individualized care that adapts to residents' needs, they made no meaningful effort to identify and address the underlying circumstances of Mr. Sewall's falls.  Had they done so, they would have realized that many if not all of his falls occurred in public places where supervision and engagement should have been readily available.  Easily available solutions include increased supervision and/or engaging him with activities.

52.     Instead, Defendant put profit over safety and chose to retain Mr. Sewall as a resident so that it could continue receiving $8,160 a month without making important safety adjustments to his care plan.  And Defendant did so in bad faith until its inactions finally caused his death.

53.     On July 3, 2022, Mr. Sewall died in Portsmouth Hospital as a result of "complications of left hip fracture," including an intraparenchymal hemorrhage, a type of stroke, that was caused by bleeding in the brain sustained during the fall.

54.     Mr. Sewall's death was easily avoidable had Defendant not ignored, for financial gain, the applicable standard of care and regulations.

55.     WOODBINE SENIOR LIVING, LLC controlled the operation, planning, management, and quality control of Spring Village at Dover.  This included, but was not limited to, control of marketing, overseeing day-to-day operations, including the provision of care, human resources management, training, staffing, creation and implementation of all policy and procedures used, and licensure and certification.

56. It is and was WOODBINE SENIOR LIVING, LLC's corporate philosophy to place its own financial wellbeing over the needs of its residents. The operational decisions that were made by WOODBINE SENIOR LIVING, LLC, as a result of that philosophy, are the proximate cause of the circumstances and events that led to Mr. Sewall's injuries and, eventually, his death. This includes but is not limited to admitting and retaining as many residents as possible due to a low census; deliberately failing to appropriately adjust supervision and safety protocol for residents demonstrating a need for a higher level of care; deliberately failing to discharge residents who require a higher level of care; deliberately failing to provide its promise of specialized memory care; and deliberately causing staffing levels to become dangerously low.

57. WOODBINE SENIOR LIVING, LLC has been the defendant in a lawsuit containing nearly identical allegations. *See Darlene Tripp as Administrator of the Estate of Gloria J. Michaud v. Woodbine Senior Living, LLC*, Docket No. 1:21-cv-00975-LM (Nov. 18, 2021). WOODBINE SENIOR LIVING, LLC was on actual notice of its deficiencies with respect to its fall risk protocol, but failed to take any remedial action thereof.

58. WOODBINE SENIOR LIVING, LLC owed a duty to Mr. Sewall to use their best efforts and to provide sufficient resources so that he could be adequately cared for. Before his admission to Spring Village at Dover, WOODBINE SENIOR LIVING, LLC knew that Mr. Sewall suffered from dementia, had a history of falls and remained at high risk for future falls, and was frail and dependent upon WOODBINE SENIOR LIVING, LLC to care for his needs.

59. WOODBINE SENIOR LIVING, LLC was not adequately providing care for the residents of the various facilities it owned and operated, including but not limited to Spring Village at Dover. WOODBINE SENIOR LIVING, LLC was aware of the complaints, concerns and problems at its facilities. WOODBINE SENIOR LIVING, LLC ignored these complaints,

concerns and problems and focused on maximizing their profits to the detriment of residents like Mr. Sewall.

60. WOODBINE SENIOR LIVING, LLC was aware of Mr. Sewall's medical condition and the care and treatment he required when WOODBINE SENIOR LIVING, LLC represented that it could adequately care for his needs. Notwithstanding this knowledge, WOODBINE SENIOR LIVING, LLC failed to provide for Mr. Sewall's needs and failed to provide sufficient staff, services, training, and supplies to meet the needs of Mr. Sewall. WOODBINE SENIOR LIVING, LLC's resident care staff was understaffed, inexperienced, and/or inadequately trained, including but not limited to the very dementia care that it marketed as being special and unique.

61. WOODBINE SENIOR LIVING, LLC failed to care for Mr. Sewall with a conscious disregard for his rights and safety. At all times mentioned herein, WOODBINE SENIOR LIVING, LLC had knowledge of, ratified, or otherwise authorized all of the acts or omissions that caused the injuries suffered by Mr. Sewall. WOODBINE SENIOR LIVING, LLC knew that, due to its lack of adequate resources, it could not provide even the minimum standard of care to the vulnerable residents of the facility and as a result, Mr. Sewall died tragically and prematurely.

62. At all times relevant herein, WOODBINE SENIOR LIVING, LLC operated and managed the facilities so as to maximize profits by reducing the resources to a level below that which was needed to provide care to the residents. Specifically, WOODBINE SENIOR LIVING, LLC intentionally and with knowing and reckless disregard for the consequences of their actions caused staffing levels, supplies, and other necessary resources to be set at a level where the caregivers could not reasonably attend to the needs of the residents. All of these acts of malfeasance directly caused injury to Mr. Sewall and were known to WOODBINE SENIOR

LIVING, LLC.  The acts and omissions of WOODBINE SENIOR LIVING, LLC were motivated by a desire to increase the profitability and net worth of WOODBINE SENIOR LIVING, LLC.

### FIRST COUNT:  RECKLESSNESS/GROSS NEGLIGENCE

63. Plaintiffs reiterate and incorporate herein the aforementioned allegations.

64. Defendants and/or their employees, agents and/or representatives had a duty of care to ensure the safety and well-being of Mr. Sewall.

65. Notwithstanding said duties, Defendants, through their agents, servants and employees, grossly failed to timely and adequately provide adequate care and treatment to Mr. Sewall, failed to modify his care plan in accordance with his needs, and further grossly failed to discharge and/or transfer him before it was too late.

66. As a direct, proximate, and foreseeable result of the Defendants' recklessness and/or gross negligence, Mr. Sewall died prematurely on July 3, 2022.

67. As a direct, proximate and foreseeable result of the Defendants' recklessness and/or gross negligence, Mr. Sewall suffered losses and damages including but not limited to his untimely and wrongful death, loss of enjoyment of life, excruciating pain and suffering, loss of income, and loss of other economic benefits and damages.

68. As a direct, proximate and foreseeable result of the Defendants' recklessness and/or gross negligence, the ESTATE OF STANLEY SEWALL incurred reasonable expenses occasioned to his estate.

69. All within the jurisdictional limits of this Court, the Plaintiff's Estate claims damages for the mental and physical pain suffered, the reasonable expenses occasioned to his estate by the injury, the loss of the probable duration of his life but for the injuries, the loss of his capacity to

earn money during his probable working life, and all other elements of damages that may be recovered under RSA 556:12.

### SECOND COUNT:  BREACH OF CONTRACT

70.   Plaintiffs reallege each allegation above as if set forth herein.

71.   Plaintiff MALLORY O'SHEA AS ADMINISTRATOR OF THE ESTATE OF STANLEY SEWALL and Defendant entered into a written contract in which Defendant promised in writing, among other things, that it could and would provide adequate care to Mr. Sewall, including specialized memory care.  Plaintiff MALLORY O'SHEA AS ADMINISTRATOR OF THE ESTATE OF STANLEY SEWALL even paid extra for "Enhanced Care."

72.   Defendants breached the contract by not providing the services it was contractually obligated to provide.

73.   As a result of the breach of contract Mr. Sewall was damaged as alleged herein.

### THIRD COUNT:  UNFAIR AND DECEPTIVE TRADE PRACTICES

74.   Plaintiffs re-allege the preceding paragraphs as if fully set forth herein.

75.   By reason of its conduct as alleged herein, Defendant violated the provisions of New Hampshire Consumer Protection Act, RSA 358-A by inducing Mr. Sewall to become admitted at its facility through the use of false and/or misleading advertising, representations and statements.

76.   The acts and omissions of Defendant alleged herein are uncured or incurable deceptive acts under this statute, which is designed to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

77.   Defendant had actual knowledge that it could not provide care to residents through the end of their life as promised.  Defendant also had actual knowledge that it was not providing the

specialized memory care and/or services it promised. Yet, Defendant failed to take any action to cure its misrepresentations.

78. By engaging in the conduct described herein, Defendants violated the Act by, among other things:

    a. engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.

    b. engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products had an approval, characteristic, ingredient, use or benefit which they did not have.

    c. engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts, the omission of which deceived or tended to deceive.

    d. engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that consumers rely upon the same.

79. To the extent Defendant's unfair and/or deceptive conduct does not fall within any of the enumerated categories under New Hampshire's Consumer Protection Act, Plaintiff MALLORY O'SHEA AS ADMINISTRATOR OF THE ESTATE OF STANLEY SEWALL alleges that Defendant's conduct as alleged herein attains a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

80. Defendant's unfair and/or deceptive acts and practices as alleged herein were willful and knowing violations of New Hampshire's Consumer Protection Act.

81. Plaintiff MALLORY O'SHEA AS ADMINISTRATOR OF THE ESTATE OF STANLEY SEWALL relied upon Defendants' misrepresentations and omissions in determining which care facility to place Mr. Sewall.

82. As a direct and proximate result of Defendant's violations of the Act, Mr. Sewall died and further suffered physical pain and mental anguish, including diminished enjoyment of life, as

well as economic hardship, including considerable financial expenses for medical care and treatment.

### FOURTH COUNT: LOSS OF CONSORTIUM

83. Plaintiffs reallege each allegation above as if set forth herein.

84. As a result of Defendant's negligence, decedent Mr. Sewall's widow, DIANE SEWALL, lost the comfort, society, and companionship of her husband, Mr. Sewall

85. Wherefor Plaintiff DIANE SEWALL is entitled to recovery of damages pursuant to RSA 556:12, III.

**WHEREFORE**, Plaintiffs seek the following relief and recovery against Defendant:

A. Compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to his death, pain and suffering, loss of enjoyment of life, all damages available under RSA 556:12, together with interest and costs as provided by law;

B. Enhanced compensatory damages;

C. All ascertainable economic damages, including past and future loss of earnings and/or earning capacity;

D. Costs, pre-trial interest, and attorneys' fees; and

E. Such further relief as may be proper and just.

Respectfully submitted,
MALLORY O'SHEA AS ADMINISTRATOR OF THE ESTATE OF STANLEY SEWALL

and

DIANE SEWALL
By Their Attorneys,

SHAHEEN & GORDON, P. A.

Dated:  April 11, 2023            /s/ Anthony M. Carr
                                  Anthony M. Carr (NH Bar # 267623)
                                  353 Central Ave., 2nd Floor

P. O. Box 977
Dover, NH 03821
(603) 749-5000
acarr@shaheengordon.com